FILED

2010 Mar-04  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| CONNIE D. ALDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   08-RRA-1103-M |
| | ) | |
| ALLSTATE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## **Memorandum Opinion**

_____This is a civil action filed by the plaintiff, Connie Alderson, against the defendant, Allstate Insurance Company ("Allstate").  The case arises out of a fire that occurred on July 20, 2007, at a home owned by the plaintiff and insured by Allstate, the defendant.  Allstate denied the plaintiff's claim.  The plaintiff filed this lawsuit, on May 15, 2008, alleging breach of contract and bad faith refusal to pay her claim.  The case now comes before the court on Allstate's motion for summary judgment.  (Doc. 15.)  Although a scheduling order was entered, no opposition to the summary judgment motion has been filed by the plaintiff.

STANDARD OF REVIEW

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.56.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary

judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, the non-moving party may not merely rest upon his pleadings, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

FACTS

As the plaintiff has filed no response or statement of facts, the defendant's statement of facts stands uncontested.[1] Those facts are as follows:

### I.    <u>Introduction</u>

1.    This case arises out of a fire and alleged theft that occurred on Wednesday, <u>June 20, 2007</u>, at the home of Connie Alderson at 115 Calhoun Street in Attalla, Alabama. (Plaintiff's Complaint). On that date, the Plaintiff had an Allstate Deluxe Homeowner's Policy insuring her home and personal property. (Certified copy of Allstate Policy, Exhibit A).

2.    Plaintiff's policy contained numerous relevant provisions that were ultimately relied upon as the basis for denial of her claim. (Ex. A). First, the insurance contract, in accordance with public policy, forbids recovery where the loss is the result

---

[1]Appendix I to the court's scheduling order provides that "All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (Doc. 7, Appendix I, p. A-7.)

of an insured's intentional criminal act, or where there are material misrepresentations made by the insured in the submission of the claim:

> We do not cover
>
>> Intentional or criminal acts of or at the discretion of any insured person, if the loss that occurs:
>>
>> a)      may be reasonably expected to result from such acts; or
>> b)      is the intended result of such acts
>>
>> This exclusion applies regardless of whether or not the insured person is actually charged with or convicted or a crime.

(Policy, Ex. A., p.11, ¶9).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Concealment or Fraud**

This policy is void if it was obtained by misrepresentation, fraud or concealment of material facts.  If it was determined that this policy is void, all premiums paid will be returned to you since there has been no coverage under the policy.

We do not cover any loss or occurrence in which any insured person has **concealed or misrepresented any material fact or circumstance**.

(Policy, Ex. A., p.5).

3.      The policy also contains the following provisions concerning an increase of risk and vandalism to a vacant or unoccupied dwelling:

**Losses We Do Not Cover Under Coverages A and B**

> We do not cover loss to the property described in Coverage A – Dwelling Protection or coverage B – Other Structure Protection consisting of or caused by:
>
> 8.      Any substantial change or increase in hazard, if changed or increased by any means within the control or knowledge of an insured person.
>
> This exclusion applies regardless of whether or not the insured person is actually charged with, or convicted of a crime.

3

(Policy, Ex. A., p.6, ¶8).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

We do not cover loss to the property described in Coverage A – Dwelling Protection or coverage B – Other Structure Protection Consisting of or caused by:

20.    Vandalism or Malicious Mischief if your dwelling is vacant or unoccupied for more than 30 consecutive days immediately prior to the vandalism or malicious mischief.  A dwelling under construction is not considered vacant or unoccupied.

(Policy, Ex. A., p.7, ¶20).

4.    As a result of the loss, Plaintiff notified Allstate and began the claim process. (Complaint).  Allstate accepted the claim and immediately learned that the fire was intentionally set. (Affidavit of Lisa Barkley, Exhibit B).  The authorities noted that gasoline was poured throughout the home and that several items of personal property were missing. (Ex. B).

5.    As a result, Allstate transferred the claim to its special investigation unit for a closer examination of the circumstances surrounding the loss. (Ex. B).  Allstate's claims adjuster, Lisa Barkley, thereafter met with the Plaintiff and obtained a recorded statement. (Ex. B; Transcript of Plaintiff's Recorded Statement, Ex. C).

**II.**    **Plaintiff's Recorded Statement**

6.    Lisa Barkley took the Plaintiff's recorded statement on <u>July 5, 2007</u>. (Ex. C).  At that time, the Plaintiff explained that the subject home was for sale with Ross Realty at the time of the fire and had been on the market for approximately four (4) months. (Ex. C, p. 10,13 [sic]).  She explained that if she continued to live in the home, her finances would be "really tight." (Ex. C, p. 10).  Although her daughter (Toni Bowman) and her granddaughter were planning on moving into the home, she stated that she still intended to sell the home and move into a trailer.  (Ex. C, p. 9).

7.    At the time of the fire, the Plaintiff told Allstate that she was dating Wayne Cornutt, who has many "problems." (Ex. C, p. 9).  The Plaintiff was recently divorced from Burland Alderson, who also had some issues, but whose "problems" paled in comparison to those of Cornutt. (Ex. C, p. 9).  She also indicated that she had surgery to remove a mass from her thyroid on <u>May 7, 2007</u>.  (Ex. C, p.14).  During her recovery period, she stated that she stayed at Cornutt's home on Highway 77. (Ex. C, p. 13-14).  As a result, she told her realtor that instead of calling her every time the house was going to be shown to just go ahead and show it because she was "not going to be home for awhile." (Ex. C, p. 13).  However, she visited her home

occasionally to check her mail and turn on a different light inside the home to give the appearance that she was home.  (Ex. C, p. 14).  She stated that the last time she had spent the night in the home was one or two weekends before the Wednesday fire when her daughter was in town to visit.  (Ex. C, p. 16).  The only persons with keys to the home were the Plaintiff, Toni Bowman (her daughter), and her son-in-law.  (Ex. C, p. 17).  She stated that Cornutt refused to take a key because he had "this thing about people trusting him." (Ex. C, p. 17).

8.      On Tuesday, <u>June 19, 2007</u>, the Plaintiff stated that she and Cornutt visited the house at approximately 4:30 or 5:00 pm to check her mail and vacuum out her car.  (Ex. C, p. 16).    At that time, she went into the house to "check things out" as she usually would and make sure the doors were all locked.  (Ex. C, p. 19). This was the last time she was at the home prior to learning of the fire, according to the Plaintiff.  (Ex. C, p.24).

9.      On the morning of the fire, the Plaintiff woke up and had a telephone conversation with a friend.  (Ex. C, p. 24).  Just after she hung up, a detective in Attalla called to tell her about the fire.  (Ex. C, p.24).  He also asked her to come to the home, which she did.  (Ex. C, p. 24).  She stated that the Detectives called Ross Realty and obtained Cornutt's number, which was apparently on file with her realtor. (Ex. C, p. 25).  After arriving at the home, she was asked to wait outside for a period of time; thereafter, she was allowed to enter the home and discovered that a computer and some electronic equipment had been removed from the home.  (Ex. C, p.27).

10.      Plaintiff stated that she learned that the call reporting the fire came in to the fire department at 8:24 am.  (Ex. C, p.25). She also stated that she was up-to-date on all bills at the time, despite money being "really tight" and having trouble making her two mortgage payments.  (Ex. C, p.10).

### III.      Additional Claim Handling and Investigation

11.      In addition to taking the Plaintiff's recorded statement, Allstate sent two adjusters - one for contents and one for the dwelling loss - to inspect the home. (Barkley affidavit, Exhibit B).  At that time, the Plaintiff was given a $1,500 advance on her contents.  (Ex. B; Deposition of Plaintiff, p. 69, Exhibit D).  Despite the fact that the local fire authorities had determined the fire was incendiary in nature, Allstate hired its own cause and origin investigator, Troy Ammons, to inspect the loss.  (Ex. B).  Ammons, like the local fire department, determined that there were three separate fires that were intentionally set, and that gasoline was poured throughout the home. (Cause and Origin Report of Troy Ammons, Exhibit E).  Plaintiff does not dispute that the fires were incendiary.  (Plaintiff's depo., p.33).

12.      Allstate also interviewed several other witnesses, including fire and police department employees, neighbors, and Wayne Cornutt.  (Ex. B).  Among other things, Allstate learned that neighbors had seen Alderson moving belongings from the home and that she had "not lived there" in months. (Ex. B).  Allstate also learned that

Alderson had refused a polygraph test and that her ex-husband, Burland Alderson, had been ruled out as a suspect by virtue of being located on a courthouse surveillance video paying a fine at the time of the fire.  (Ex. B).

13.    In light of these facts, Allstate retained Attorney Sue Williamson to take the Plaintiff's Examination Under Oath and render a legal opinion on coverage. (Ex. B).  Throughout the time that her claim was being investigated, Plaintiff received additional living expense payments of $450.00 per month.  (Plaintiff's depo., p. 71 - 72).  Allstate never denied a single request for ALE.  (Plaintiff's depo., p. 72).

### IV.    Plaintiff's Examination Under Oath

14.    Plaintiff's EUO was taken on <u>October 11, 2007,</u> and continued on <u>October 29,2007.</u>  (EUO transcripts attached as Exhibit F).  In her Examination Under Oath, Plaintiff reiterated the basic facts and circumstances leading up to the fire.  (Ex. F).  She testified that she was last at the home at 5:30 p.m. on the Tuesday evening before the Wednesday morning fire, and that she and her daughter, Toni Bowman, had the only keys to the home.  (EUO, p.6,11).  She acknowledged that there was no evidence of forced entry, and she certainly does not suspect her daughter in starting the fire.  (EUO, p.12; Alderson depo., p.42).  She testified in her EUO that the call from Detective Walker telling her of the fire came to her cell phone.  (EUO, p.28). There is no record of this call within her cellphone records.  (Alderson depo., p.44-49; Verizon records, Ex. G).

15.    She also testified that in the two weeks prior to her fire, she probably stayed at her home a total of three nights.  (EUO, p.32).  She testified that she stayed at Wayne Cornutt's house "quite a bit."  (EUO, p.32).  Unlike in her Recorded Statement, in her EUO she testified that her home was for sale because she had too many bad memories and she was too old to keep it up.  (EUO, p.38).  Her total monthly income was $1,362.00 per month, and she had only approximately $4,000 left from an inheritance of $60,000.  (EUO, p. 40, 63-64).  <u>Her reported monthly expenses, which included minimum payments on 6 credit cards and two mortgages, exceeded her monthly income</u>.

### V.    Advice of Counsel

16.    Based on the evidence gathered and facts established, Attorney Williamson recommended that Allstate deny the Plaintiff's claim.  (Affidavit of Sue Williamson, Ex. H).  The denial recommendation was based upon arson, violation of the concealment and fraud provisions of the policy and Alabama Code §27-14-28 (material misrepresentations in proof of loss), violation of the Vandalism and Malicious Mischief provision of the policy, and violation of the Increase In Hazard policy provision.  (Ex. H).

17.    Based upon its investigation and the advice of counsel, Allstate denied the Plaintiff's claim.  Plaintiff thereafter filed the instant lawsuit alleging breach of

contract and bad faith.

    **VI.**    **Plaintiff's Deposition Testimony**

    18.    When asked at deposition why she told Detectives that she wasn't living at the subject home, Plaintiff testified that she "didn't mean that." (Plaintiff's depo., p.31). However, she later explained that the steep dropoff in her utility bills was because she turned off all utilities "when she moved." (Plaintiff's depo., p.38).

> Q.    Okay.  I'll show you what I'm going to mark as Exhibit 3, and these are documents that the Attalla Water Works Board sent to us in response to a subpoena.  And I want to see if you can help me figure something out here.  It looks like, if I'm reading this correctly, it shows in this column right here the usage amount for each month on each row.  And then as you go down, there's a considerable decrease down around March and on through June.  There's essentially – it looks like a minimum charge being applied.  Do you have any idea how that happened?
>
> > (Whereupon, Defendant's Exhibit Number 3 was marked for identification.)
>
> A.    **Well, that's probably when I was staying at Wayne's, you know, a lot.**
>
> (Plaintiff's depo., p. 33,-34; Water Bills, Exhibit I).
>
> Q.    Just looking at here, and I know we're not electric engineers or anything, but you had bills running in 200 to $300 for 2000 – over 2000 kilowatt hours.  And then we go on down to June when this fire happened, and we're talking about $78 bill and 624 kilowatt hours?
>
> A.    **Well, see, when I moved, I turned my, you know, my heater off and my air conditioning off or – like I tried to tell my kids to do.**
>
> Q.    Did you do that when you lived there?
>
> A.    No.  I turned it on when I was there.  Unless it was a real nice day, you know, I'd turn the attic fan on.
>
> (Plaintiff's depo., p. 37-38; Electric Bills, Exhibit J)

    19.    Plaintiff could not explain why her home telephone service, which

billed her up to almost $30.00 per month for long distance calling in late 2006, declined to the point of showing no long distance calls by May, 2007:

> Q.     Okay.  I noticed though, that at some point you dropped your long distance plan; do you recall that?
>
> A.     I never made long distance calls.
>
> *******************************
>
> Q.     December 2006, again,  there's a $27.56 charge?
>
> A.     Well, I guess I just started cutting back as much as I could.
>
> Q.     And so, if you go up to – let's see, April of 2007, long distance charges of $7.27, and I think when you get to May, there's no long distant charges at all.  Were you not using the phone there?
>
> A.     Well, yeah.  I'll, you know, I'd use the phone, but just cause I didn't make a long distance call. 'Cause other than my daughter that lived in Birmingham, I didn't know anybody else to call.
>
> Q.     **Well, if suddenly you were making plenty long distance calls in the late part of 2006, early 2007 and then we get to a month or two before the fire and you're not calling anybody?**
>
> A     **Well, if I did call her, I called her from my cellphone**.
>
> Q.     **Didn't you have a cellphone back in the late part of '06 and early part '07?**
>
> A.     **Yeah.**
>
> Q.     **Why didn't you use your cell phone then?**
>
> A.     **I don't know.  I called her from the house.  I don't know why I did.**

(Plaintiff's depo., p. 100 - 102; BellSouth records, Exhibit K) Utility records pertaining to the subject residence clearly indicate that the home was unoccupied.

(Doc. 15-2, pp. 1-10) (emphasis in original).

ANALYSIS

The plaintiff presents the court with two claims: bad faith and breach of contract. The plaintiff's bad faith claim cannot survive if the plaintiff is not entitled to recover on her breach of contract claim. *See National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982). The court will examine first the plaintiff's breach of contract claim.

Not entitled to recover for loss of home because of arson:

A plaintiff making a breach of contract claim must establish (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's non-performance, and (4) damages. *State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 303 (Ala. 1999), citing *Southern Medical Health Systems, Inc. v. Vaughn*, 669 So.2d 98, 99 (Ala.1995).

In the instant case, it is undisputed that there is a valid insurance contract between the plaintiff and Allstate. However, there cannot be non-performance by Allstate if Allstate is not liable under the insurance contract. *See, e.g. Mueller v. Hartford Ins. Co. of Alabama*, 475 So.2d 554 (Ala. 1985)("Arson by an insured is an absolute defense to an action upon the policy, even in the absence of language in the policy so providing.") The subject policy provides coverage only for losses caused by sudden and accidental events, and it excludes coverage for losses that result from the intentional or criminal acts of the insured person, or from such acts committed at the direction of the insured. Allstate contends that there is no coverage because the fire was the result of arson attributable to the plaintiff.

> To establish an arson defense under Alabama law, an insurer must " 'prove by competent and relevant evidence arson by someone, motive by the plaintiff and unexplained surrounding circumstantial evidence implicating the plaintiff.' " *Mueller*

*v. Hartford Insurance Co.*, 475 So.2d 554, 557 (Ala.1985) (*quoting Great Southwest Fire Insurance Co. v. Stone*, 402 So.2d 899, 900 (Ala.1981)). The insurer's burden of proof is not particularly heavy. Proof may be made by circumstantial evidence "if the inferences are not too remote and all circumstances, including the inferences, are of sufficient force to bring minds of ordinary intelligence to a persuasion of incendiarism by a fair preponderance of the evidence." *Id.* Proof beyond a reasonable doubt, or proof by direct evidence, is not required.

*Fondren v. Allstate Ins. Co.*, 790 F.2d 1533, 1535 (11th Cir. 1986).

It is uncontroverted that the fire in question was caused by arson. Thus, the first element of the defense is met. As to the plaintiff's motive, the Alabama Supreme Court has stated:

> In the cases we have reviewed on this issue, the most common evidence discussed as supporting the motive element of arson deals with the financial condition of the insured or the prospective financial benefit an insured stood to receive from the burning of the insured's property. *See Shadwick, supra* (noting that the evidence showed the insured had two mortgages on the burned house, the insurance proceeds would pay the insured's debts and leave cash in hand, and the insured had insufficient income to support her children and attend school full-time); *Bush v. Alabama Farm Bureau Mut. Casualty Ins. Co.*, 576 So.2d 175 (Ala.1991) (citing the insured's "financial trouble": three mortgages on the burned house, monthly bills equivalent to monthly income; being made defendants in a lawsuit claiming $50,000 in damages); *Bryant v. State Farm Fire & Casualty Ins. Co.*, 447 So.2d 181 (Ala.1984) (insured did not make enough money to cover her debts, had two mortgages on the house, and was receiving money from her mother); *Stone, supra* (noting that the insurance proceeds would leave the insured with $9,000 cash in hand); *Fondren, supra* (evidence that the insureds were "in extremely poor financial condition"). In *Williams v. Allstate Ins. Co.*, 591 So.2d 38 (Ala.1991), this Court affirmed a judgment entered on a jury verdict for the insurance company in its declaratory judgment action against the insured. In reviewing whether the circuit court erred in denying the insured's motion for a summary judgment on his counterclaim alleging breach of contract and bad faith, the Court concluded that there was substantial evidence of the motive element of the insurance company's arson defense, because the insured was in Chapter 11 bankruptcy and in "financial need." *Id.*, 591 So.2d at 41.

*Pennsylvania Nat. Mut. Cas. Ins. Co. v. Lane*, 656 So.2d 371, 375-376 (Ala.,1995).

Allstate's investigation revealed that the plaintiff was having difficulty affording the home and wanted to relocate at the time of the fire. The plaintiff states that she was trying

to sell her house, that she had been living substantially, if not entirely, with Wayne Cornutt, and that she was having trouble making her two mortgage payments on the home and wanted to move to a trailer in another area.   The plaintiff also stated that she wanted to move because she had "too many bad memories" associated with that home. Financial records confirm that the plaintiff's monthly income did not meet her expenses.   Therefore, the plaintiff had motive to set the fire.

Finally, there were unexplained circumstances surrounding the fire which implicated the plaintiff's involvement. The evidence shows that the plaintiff and her boyfriend, Wayne Cornutt, were the last persons at the home.  Only the plaintiff and her daughter had keys to the home. The plaintiff stated that her daughter could not have set the fire.  Moreover, there is no evidence of pre-fire forced entry, which means that only the plaintiff or someone to whom she gave a key could have entered the home, taken the contents found to be missing, and set three separate fires.  Also, while the plaintiff initially stated that neither she nor Cornutt ever left Cornutt's home after visiting the subject home just hours before the fire, cell phone records indicate that a call was made from Cornutt to Alderson at 1:04 a.m; when confronted with this information, the plaintiff suddenly recalled that Cornutt had gone to Wal-Mart to buy medicine.

Plaintiff has not come forward with any evidence to rebut Allstate's showing that the elements of arson have been met in this case. Thus, Allstate's decision to deny the claim was correct, and the plaintiff's breach of contract claim is due to be dismissed as a matter of law.

Alternatively, not entitled to recover for home due to misrepresentations:

Alternatively, the defendant is entitled to summary judgment on the ground that the

plaintiff violated other provisions of the insurance contract which negate her right to policy benefits. The evidence demonstrates that the plaintiff made several misrepresentations to Allstate during the course of its investigation.

Alabama law states:

No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy **unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy**.

Alabama Code, 1975, §27-14-28 (emphasis added). Thus, if the insured is found to have made a misrepresentation in a claim, and that misrepresentation is intended to deceive the insurer, the obligations of the insurer under the policy are voided.

The policy in question also contains a provision which addresses misrepresentation. It states, **"We** do not cover any loss or **occurrence** in which any **insured person** has concealed or misrepresented any material fact or circumstance." (*Allstate Policy*, Exhibit A to defendant's motion for summary judgment)(emphasis added). This policy provision requires the denial of coverage even where a material misrepresentation is made without an intent to deceive.

The plaintiff told Allstate in a recorded statement that she had the house for sale because she could not afford it and wanted to move to a more affordable trailer home:

A.      Well, actually, I had my house up for sale.  I put that up for sale about four months ago but me and my daughter was going to live here but you can't sale [sic] a house in four months sometimes it takes years and years.

Q.      Well, it's just got to be the right person, you know, this is the right area for them, this is the type house they need.

A.      And uh, that's where I'm going is out there.  It's so peaceful out there and I'm going to buy me a trailer cause I can't afford the house, you see I'm on disability, I drove a school bus for 20 years and I had a (inaudible) disc in my neck

that got into my spinal cord and messed up my right leg.

Q.    Oh I'm sorry.

A    But the doctors took me off my medicine [sic], I can make my house payment and the utility bills and the car is paid for but it would be really tight.  I had a roommate for awhile.

Q.    Since Mr. Alderson moved?

A    Yeah.  But I am not getting married again just to keep a house.  So, I put it up for sale and like I said, my daughter was going to move in with me and help me some but...

Q    Then maybe ya'll could have split for things  you know you could have maybe helped you out a little bit.

A    Yeah.  But I was still gonna sale [sic] it and maybe she cause [sic] have moved in the trailer with me and if she finds her own place that's just going to make it easier for me because I'm getting old.  I love the house, I feel like I'm in Gatlinburg.

(Recorded Statement of Plaintiff 10.)

Later, when asked the same questions, the plaintiff testified under oath as follows:

Q.    Okay.  So I guess once you got a buyer for house, then you were going to decide where you were living?

A.    Uh-huh.

Q.    Okay.  Why were you going to sell it?

A.    Too many bad memories.  And somewhere down the road, you know, houses need fixing and I'm just not able to keep it up, keep up the yard.

(Plaintiff's EUO 38.)

Finally, at her deposition, the plaintiff testified that she was not going to sell the

house:

Q.    Your house was for sale at the time of the fire, was it not?

A.    Yes.

Q.    How long had it been on the market?

13

A.      Just a couple months.  But I was fixing to take it off the market because my daughter was moving in with me.  Between me and her, you know.

(Alderson Depo. 81-82.)

Q.      So, why did -- why did it take you so long to take that -- I mean, why hadn't you taken the sign out the yard when she had made that decision?

A.      Procrastination.

Q.      You hadn't called and told your agent?

A.      Not yet.

Q.      You didn't think about the possibility that somebody could come buy it and then y'all –

A.      I wouldn't have sold it. You don't have to sell it.

*Id.* at 82-83.

At some point the plaintiff misrepresented the true reason for her placing the home for sale.  If the plaintiff's deposition testimony is accepted as true, the plaintiff misrepresented in both her EUO and her recorded statement her reasons for selling.  If one were to believe *either* that the plaintiff's EUO testimony or her recorded statement was accurate, the deposition testimony would be a misrepresentation. The reasons the house was up for sale is material in an investigation into the cause of the fire.  The plaintiff's initial statement that she could not afford the home is evidence of a motive for arson.

Additionally, the plaintiff misrepresented the status of the home's occupancy.  When discussing the arrangements made by Alderson to have the home shown, the plaintiff stated as follows:

Q.      Did you have any lookers anybody interested?

A.      Oh yeah all the time they were bringing somebody up here.  I had thyroid surgery about five weeks ago and they were always calling me to make sure

14

> I was gonna be gone this that and the other and I told them I was gonna stay with Wayne while a recuperated and I just told them I'm not going to be at home for awhile if you got somebody to show it to just go ahead and show it because I said I'm gonna be recuperating.

(Recorded Statement of Plaintiff 13.)  The plaintiff further stated that she had stayed at the home only on, perhaps, three nights in the previous two weeks, when her daughter and granddaughter were in town to visit. *Id.* at 16.  Later, the plaintiff stated that she spent about half her time at home and half her time at Wayne Cornutt's home. These statements are inconsistent with the indisputable lack of use of her utilities as reflected by records from her utility providers.  The fact that the plaintiff did not occupy the home is material to an arson investigation because it is evidence that the plaintiff was not dependent upon the house as a place to live.

Finally, the plaintiff was not forthright when discussing her and Cornutt's whereabouts in the hours prior to the fire.  Only when the plaintiff was confronted with her cell phone records did she acknowledge that Cornutt was not with her in the early morning hours leading up to the fire.  Such information is material to determining the plaintiff's involvement in setting the fire.

<u>Not entitled to recover for vandalism:</u>

The plaintiff has made a claim under the "vandalism" provisions of the policy. First, the plaintiff is not entitled to recover for acts of vandalism if such damages actually were caused by her own actions or caused by the actions of another person that are attributable to the plaintiff. Moreover, the Allstate policy specifically excludes coverage for vandalism occurring when  the house has been "vacant" or "unoccupied" for more than thirty consecutive days. (Certified Policy, Ex. A, p.7, ¶20). The Alabama Supreme Court has stated:

15

> [w]e consider that the trial court correctly defined "vacant" and "unoccupied" in relation to a dwelling as those terms are commonly accepted in the insurance industry and by the general public. Those definitions are: "vacant" means empty, without inanimate objects, containing nothing. "Unoccupied" means without occupants, animate objects; a dwelling is unoccupied when it has ceased to be used as a place of abode or residence by people. 47 A.L.R.3d 398; 43 Am.Jur.2d "Insurance", ss 947, 955. 29 Words & Phrases, "occupancy," "occupied dwelling."

*National Sec. Fire & Cas. Co. v. James,* 358 So.2d 737, 739 (Ala.Civ.App.,1978).

The plaintiff has offered sworn testimony that she had stayed at the home two or three nights in the weeks before the fire, and that she stayed there only because her daughter and granddaughter were in town visiting. The plaintiff's utility records, as well as her statements to officers that she was "living with" Cornutt, establish that the home was unoccupied. Her neighbors have stated that she had not lived there "for months." The evidence demonstrates that the plaintiff's residence was "unoccupied" at the time of the loss. Risk of loss increases when a home is unoccupied, and thus the policy contains an "increase of hazard" exclusion.[2] (Policy, Ex. A., p.6, ¶8). It is not necessary that the increase of hazard be the cause of the actual loss. 44 AmJur 2d *Insurance* §1198, *citing Quam v. General Acc. Ins. Co. of North America*, 411 N.W. 2d 270 (Minn. Ct. App. 1970).

## CONCLUSION

Wherefore, the defendant is entitled to summary judgment on the plaintiff's bad faith claim and breach of contract claim. An appropriate order will be entered contemporaneously with this memorandum opinion.

---

[2]The plaintiff recognized that her unoccupied home was a potential target of thieves and vandals when she stated that she would, on the occasions that she was at the home, strategically park her vehicle in an area that would deter a potential intruder. Additionally, she acknowledged that she turned on different lights within the home to give the appearance that it was occupied. Further, when she returned to the house, she always walked through it to make sure it was secure and that no one had been inside or stolen anything.

DONE this 4th day of March, 2010.

Robert R. Armstrong, Jr.
United States Magistrate Judge